IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COLONIAL MORTGAGE SERVICE CO., <br><br>         Plaintiff, <br><br>   v. <br><br> COMMONWEALTH LAND TITLE INSURANCE CO., <br><br>         Defendant. | CIVIL ACTION <br> NO. 14-3807 |

## OPINION

**Slomsky, J.**                                                      **November 14, 2014**

## I.      INTRODUCTION

This case involves a dispute over the terms of a title insurance policy and the extent to which an insurer is obligated to defend its insured under the policy.  On May 27, 2014, Plaintiff Colonial Mortgage Service Co. ("Plaintiff" or "Colonial") filed a Complaint against Commonwealth Land Title Insurance Co. ("Defendant" or "Commonwealth") in the Court of Common Pleas of Philadelphia County.  (Doc. No. 1.)  The case was removed to this Court on June 19, 2014 pursuant to diversity of citizenship jurisdiction.  (Id.)

In the Complaint, Colonial alleges that it purchased title insurance from Commonwealth and when coverage was sought under the policy, Commonwealth denied coverage.  As a result, Colonial filed the instant suit alleging in the Complaint four claims: (1) breach of contract; (2) bad faith; (3) violation of the New Jersey Consumer Fraud Act; and (4) equitable estoppel. (Doc. No. 1.)

On August 11, 2014, Colonial filed a Motion for Partial Summary Judgment on the breach of contract claim.  (Doc. No. 14.)  On August 25, 2014, Commonwealth filed a Cross-

Motion for Partial Summary Judgment and a Response to Colonial's Motion.  (Doc. Nos. 16, 17.) The Motions have been fully briefed by the parties and are ripe for disposition.[1]  The following facts, essentially set forth chronologically, are central to the decision on the Motions.

## II.    BACKGROUND

### A.    Customers Bank's Involvement with the Bigos and Thomas Property

Initially, and to understand the underlying basis for the claims made in this case, a factual review of transactions involving nonparties to this action is necessary.  The nonparties are Customers Bank ("Customers"), Capital Financial Mortgage Corp. ("Capital"), and Park Avenue Abstract, Inc. ("Park").

Customers is a banking financial institution.  (Doc. No. 18-1 at ¶ 1.)  Capital was a mortgage company that provided mortgage loans and mortgage refinancing to borrowers.[2]  (Id. at ¶¶ 2-3.)  Capital had an $11 million "warehouse" line of credit from Customers.[3]  (Id. at ¶ 4.) These funds were wired into an account held by Park, a title company that provides title, closing, settlement, and escrow services.  (Id. at ¶ 7, 24.)  Customers believed that the money would be

---

[1] In deciding Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross Motion, the Court has considered the Complaint (Doc. No. 1), the Motions (Doc. Nos. 14, 16), Defendant's Response (Doc. No. 17), Plaintiff's Reply and Response to Defendant's Cross Motion (Doc. No. 18), and Defendant's Reply to Plaintiff's Response (Doc. No. 19), and the pertinent exhibits.

[2] Capital has ceased operating.  (Doc. No. 18-1 at ¶ 66.)

[3] "With a warehouse line of credit, a mortgage company uses borrowed funds to originate mortgage loans that will eventually be packaged and sold on the secondary market or securitized."   Julie Forrester, Still Mortgaging the American Dream: Predatory Lending, Preemption, and Federally Supported Lenders, 74 U. Cin. L. Rev. 1303, 1350-51 (2006). "After each mortgage loan is made, the note and deed of trust are temporarily pledged to the bank as collateral for the line of credit.  It is called a warehouse line of credit because the mortgage loans are parked in the bank's warehouse for a short period . . . until the mortgage company is ready to sell them to secondary market investors . . . ."  Id. at 1351 n. 373. (internal quotations omitted)

used by Capital to: (1) satisfy mortgages of borrowers refinancing mortgages with Capital, or (2) satisfy the sellers' mortgages on properties purchased by Capital borrowers.  (Id. at ¶ 4.) Unbeknownst to Customers, the funds were not used to satisfy outstanding mortgages in both situations, but instead were stolen by Capital, Park, and others.[4]  (Id. at ¶ 29-30.)

A specific instance of this alleged fraud occurred with respect to the purchase of property in New Jersey ("the Property") by Rebecca Bigos ("Bigos") and Matthew Thomas ("Thomas"). Customers lent funds to Capital for Bigos and Thomas to buy the Property.  (Doc. No. 18-1 at ¶ 33.)  On or about February 22, 2013, Customers issued a Closing Protection Letter in connection with the closing on the Property.  (Id.)  Thereafter, Customers made the loan to Bigos and Thomas through Capital believing that at closing, the existing mortgage on the Property would be satisfied.  (Id. at ¶¶ 36-37.)

On March 4, 2013, a Park representative falsely told Customers that the closing on the Property had occurred.  (Doc. No. 18-1 at ¶ 38.)  In reality, the closing did not occur and Customers' funds were not used to satisfy the existing mortgage of the seller of the Property.  (Id. at ¶ 39-40.)  Instead, the money was stolen by Capital and Park.[5]  After learning that the funds were not used to pay off the preexisting mortgage, Customers filed a lis pendens on the Bigos and Thomas Property on April 11, 2013.[6]  (Id. at ¶ 56.)  Customers filed the lis pendens to give

---

[4] The Complaint indicates that the warehouse funds were to be used for the two purposes described above.  However, the Complaint focuses on Capital and Park's failure to use the funds to satisfy sellers' preexisting mortgages, rather than the failure to use the funds to satisfy borrowers' preexisting mortgages when refinancing with Capital.

[5] On March 15, 2013, David Fili, owner and president of Capital, confessed to his participation in the scheme to defraud Customers.  (Doc. No. 18-1 at ¶¶ 43-50.)  Fili identified the closing on the Thomas and Bigos Property as one of many fraudulent transactions.  (Id. at ¶ 50.)

[6] A lis pendens "has the effect of providing constructive notice to the world of an alleged claim of a lien or an interest in a property."  51 Am. Jur. 2d Lis Pendens  § 1 (2014).

notice of its interest to potential purchasers of the Property.  In addition, Customers has asserted that it has an equitable lien on the Property as of March 4, 2013, when it was falsely informed that the closing had occurred.  (Id. at 41.)

**B.**   **Colonial's Transactions with Respect to the Bigos and Thomas Property and its Purchase of Title Insurance from Commonwealth**

Plaintiff Colonial operates a mortgage lending business in Pennsylvania and New Jersey. (Doc. No. 1, Ex. A at ¶ 12.)  Defendant Commonwealth is a title insurance company.  In March 2013, Colonial, apparently unaware of the transaction described above between Customers and Capital, made a loan to Bigos and Thomas for the purchase of the Property.  (Id. at ¶ 13.)  On March 29, 2013, the closing on the loan was held, and Bigos and Thomas executed a Note and Mortgage in favor of Colonial.  (Id. at ¶ 14.)  The Mortgage gave Colonial a first-priority security interest in the Property.  (Id. at ¶ 15.)

In connection with the loan, Colonial purchased a lender's title insurance policy (the "Policy") from Commonwealth.  (Doc. No. 1, Ex. A at ¶ 17.)  On May 6, 2014, the Policy was issued and the insured mortgage was recorded in Camden County, New Jersey.  (Id. at ¶¶ 19-20.)

**C.**   **Colonial's Assignment of the Note and Mortgage**

Following the closing on the Property, Colonial assigned the Note and Mortgage to U.S. Bank, National Association ("U.S. Bank").[7]  (Doc. No. 1, Ex. A at ¶ 18.)  Colonial entered into a "Correspondent Mortgage Purchase Agreement" ("Correspondent Agreement") dated August 16, 2010 with U.S. Bank.  (Doc. No. 14-4, Ex. C at 1.)  In the Agreement, Colonial made representations and warranties to U.S. Bank, including that the Mortgage conveyed "a valid and legally enforceable first lien obligation in favor of the Seller with respect to the Mortgage Note [sic] that is superior to all other liens or . . . claims."  (Id. at 3.)

---

[7] The date of the transfer is not disclosed in the record.

4

The Agreement binds Colonial to repurchase the loan sold to U.S. Bank in the event that any representation or warranty made by Colonial was false when made or "becomes false upon the occurrence of subsequent events." (Doc. No. 14-4, Ex. C at 6.) The Agreement also states that Colonial will cover the cost of protecting and indemnifying U.S. Bank "in respect to, any and all losses, liabilities, reasonable costs, and expenses, including attorneys' fees, that may be incurred by [U.S. Bank] with respect to, or proximately resulting from any breach of any representation, warranty, or covenant of [Colonial] hereunder." (Id. at 7.)

### D.    The New Jersey Litigation

Following the above-described events, on June 16, 2013, Customers filed a lawsuit against Colonial in the Superior Court of New Jersey. (Doc. No. 1, Ex. A at ¶ 24). On October 22, 2013, Customers added Commonwealth as a defendant in the case. (Id.) On February 14, 2014, Customers filed a Second Amended Complaint. (Doc. No. 18-1 at 27.) The allegations in this Complaint are crucial to the present action.

The Complaint in the New Jersey litigation alleges several claims against Colonial and Commonwealth premised on the transactions relating to the Bigos and Thomas Property. Customers alleges that on May 6, 2013, when Colonial recorded its Mortgage on the Property, Customers' lis pendens had already been filed. (Doc. No. 18-1 at ¶ 56.) Therefore, Customers claims that at the time Colonial recorded its mortgage, it was aware of the lis pendens filed against the Property. (Id. at ¶¶ 73-75.) Customers also avers that Colonial knew or should have known at the time of the recording of its mortgage that Customers had an equitable lien on the Property. (Id. at ¶ 89.) The Complaint further states that by "[taking] deliberate steps to hinder and interfere with Customers' contractual and equitable rights in the Bigos property," Colonial acted intentionally. (Id. at ¶ 93.)

5

The allegations in the Complaint against Colonial continue. Customers asserts that Colonial hired nine former employees of Capital after Capital essentially unraveled in light of the fraud. (Doc. No. 18-1 at ¶¶ 65-67.) According to Customers, by hiring the former employees and salespersons of Capital and transferring files and business from Capital, Colonial engaged in a "systematic fraud to harm Customers . . . . [by] fund[ing] transactions related to property for which Customers had previously provided 'warehouse' funding." (Id. at ¶ 84.)

In the New Jersey action, Customers brought six claims against Colonial. The claims include: (1) a request for a constructive trust[8] because "[i]n equity and good conscience, Park Avenue and Colonial should not have recorded Colonial's mortgage on the Bigos property"[9] (Doc. No. 18-1 at ¶¶ 99-100); (2) constructive fraud[10] because Colonial and others "were aware of Customers' equitable lien in the property" and were aware that Customers had provided funding for closing on the Property at the time Colonial had closed and recorded the Mortgage on the Thomas and Bigos Property (Id. at ¶¶ 101-03); (3) Negligence (Id. at ¶¶ 108-13); (4) tortious interference with contract for "intentionally, without justification or excuse, interfering with Customers' rights in closing on the Bigos property" (Id. at ¶¶ 123-26);

---

[8] A constructive trust "is a relationship with respect to property subjecting the [title holder] to an equitable duty to convey it to another on the ground that his acquisition . . . of the property is wrongful and that he would be unjustly enriched if he were permitted to retain [it]." Hill v. Warner, Berman & Spitz, P.A., 484 A.2d 344, 352 (N.J. Super. Ct. App. 1984).

[9] Park is included in this claim because representatives of Park misrepresented to Customers that a closing on the Bigos and Thomas Property had occurred and that Customers' funds were used to satisfy the prior mortgage. (Doc. No. 18-1 at ¶¶ 27, 28.) Agents of Park then acted as the closing, settlement, title, and escrow agent for Colonial at the closing on the Bigos and Thomas Property. (Id. at ¶ 34.) As a result, Customers asserts that Park should not have recorded Colonial's Mortgage because it was aware of Customers' interest in the Property.

[10] A constructive fraud under New Jersey law is "not a fraud at all but is descriptive of conduct which may in the eyes of the law give rise to certain consequences ensuing upon actual fraud." Bedrock Foundations Inc. v. Geo. H. Brewster & Son, Inc., 155 A.2d 536, 542 (N.J. 1959).

(5) successor liability because Colonial "knowingly continu[ed] and participat[ed] on [sic] a closing on the Bigos property after the closing described [to Customers] failed to occur" and is therefore "liable for the actions of [Capital] with respect to the fraudulent Bigos closing" (Id. at ¶¶ 127-35); and (6) civil conspiracy because Colonial entered into an agreement with Park and others to defraud Customers (Id. at ¶¶ 136-45).

### E.     Commonwealth's Denial of Coverage

On June 20, 2013, Colonial's in-house counsel emailed a copy of Customers' Complaint to Commonwealth.  (Doc. No. 9 at ¶ 31.)  According to Commonwealth, Colonial "did not at that time assert a claim for coverage under the Policy."  (Id.)  Colonial claims, however, that it sent a formal claim for coverage on July 8, 2013.  (Doc. No. 1, Ex. A at ¶ 31.)  Commonwealth denies receiving this request.  (Doc. No. 9 at ¶ 31.)  Rather, Commonwealth asserts that in a letter dated November 26, 2013, it received a formal request for coverage by Colonial.  (Id.)

Meanwhile, as a defendant named in Customers' Amended Complaint, Commonwealth engaged a law firm to represent it in that case.  (Doc. No. 9 at ¶ 35.)  Colonial hired the same law firm based on its assumption that under the Title Insurance Policy, Commonwealth would pay for all litigation costs.  (Doc. No. 1, Ex. A at ¶ 7.)  For some time Commonwealth did not object to the simultaneous representation.  (Id. at ¶¶ 35-37.)  By March 2014, Colonial had not received in writing a decision by Commonwealth on whether it would defend Colonial in the lawsuit under the terms of the Title Insurance Policy.  (Id. at ¶ 40.)  Growing concerned that Commonwealth intended to deny coverage, Colonial substituted counsel by retaining its own lawyer.  (Id. at ¶ 41.)

Finally, in a letter dated March 26, 2014, Commonwealth denied coverage and declined to engage counsel to represent Colonial in Customers' state court action.  (Doc. No. 1, Ex. A at ¶

7

43.)  In the letter, Commonwealth explained that because Colonial had assigned the Note and Mortgage, "Colonial does not appear to be an insured as defined under provisions of paragraph 1(e) of the Policy."  (Id. at ¶ 44.)  Paragraph 1(e) includes a definition of the word "Insured" under the Policy.  (Id. at ¶ 45.)

### F.    Terms of the Policy

The Title Insurance Policy contains several sections which describe the insured Property, Commonwealth's obligations under the Policy, exclusions from coverage, and the conditions of coverage.  (Doc. No. 1, Ex. A at 27.)  The sections of the Policy relevant here include: (1) a description of the Property in the section titled "Schedule A;" (2) a detailed list of risks covered under the Policy in the section titled "Covered Risks;" (3) a list of matters excluded from coverage found in the section titled "Exclusions from Coverage;" (4) the definition of the terms "Insured" and "Title" found in the "Definition of Terms" in the section of the Policy on "Conditions"; and (5) a provision titled "Continuation of Insurance," also under the "Conditions" section of the Policy.

The various sections are reproduced and discussed later in this Opinion.

## II.    STANDARD OF REVIEW

### A.    Summary Judgment Standard

Summary judgment is an extraordinary remedy.  Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir.

8

2013) (quoting Azur v. Chase Bank, USA, Nat.l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (internal quotation marks omitted)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata, 511 App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur, 601 F.3d at 216 (internal quotation marks omitted)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009) (internal quotation marks omitted)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477 U.S. at 247-49.  Whenever a factual issue arises which cannot be resolved without a credibility determination, the Court must credit the non-moving party's evidence over the evidence presented by the moving party.  Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

In this case, the parties filed cross-motions for summary judgment.  "The same standards and burdens apply on cross-motions for summary judgment."  Allah v. Ricci, 12-4095, 2013 WL

9

3816043, at *50 (3d Cir. July 24, 2013) (citing <u>Appelmans v. City of Phila.</u>, 826 F.2d 214, 216

(3d Cir. 1987)).  When the Court is confronted with cross-motions for summary judgment,

> [T]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.  If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.

<u>Hussein v. UPMC Mercy Hosp.</u>, No. 09-00547, 2011 WL 13751, at *2 (W.D. Pa. Jan. 4, 2011)

<u>aff'd</u>, 466 F. App'x 108 (3d Cir. 2012) (internal quotation marks omitted).

### B.    Application of New Jersey Law in Interpreting the Policy

The Title Insurance Policy contains a "Choice of Law" provision.  It reads as follows:

> the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy.  In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(Doc. No. 1, Ex. A at 43.)  Where parties have included a choice of law provision in an insurance

policy, courts will enforce it.  <u>Walters v. Am. Home Assurance</u>, No. 09-4637, 2011 WL 4409170,

at *5 (D.N.J. September 21, 2011).  This Court will enforce the choice of law provision in the

Policy and apply New Jersey law because the insured "Land" is located in New Jersey.  (Doc.

No. 1, Ex. A at 33).[11]

## III.   ANALYSIS

On March 26, 2014, Commonwealth denied Colonial's request for coverage under the

Title Insurance Policy in the New Jersey litigation.  (Doc. No. 1, Ex. A at ¶ 43.)  The relevant

facts described above leading to that decision are not in dispute.  Instead, the parties disagree on

whether Commonwealth's denial of coverage is a breach of contract.  Specifically,

---

[11] Both parties requested application of New Jersey law.  (Doc. No. 14-1 at 10; Doc No. 16-1 at 4-5.)

Commonwealth contends that Colonial ceased to be an insured under the Policy when Colonial assigned the Note and Mortgage to U.S. Bank.  In addition, Commonwealth contends that in view of the kinds of claims that Customers has asserted in the Second Amended Complaint against Colonial in the New Jersey litigation, no coverage is provided under the Policy because the claims are not included in the "Covered Risks" section.

Colonial, on the other hand, argues that the terms of the Policy make no reference to coverage ceasing upon the transfer of the Note and Mortgage.  Colonial also submits that the claims made by Customers against Colonial in the New Jersey litigation are covered risks under the Policy.

### A. Colonial Was Insured Under the Policy Even After Transferring the Note and Mortgage

Colonial argues in its Partial Motion for Summary Judgment that Commonwealth breached the Title Insurance Policy, which is a contract, by denying Colonial's request for coverage in the New Jersey litigation.  To establish a breach of contract in New Jersey, the party asserting the breach must show that: (1) the parties entered into a valid contract; (2) the defendant failed to perform its obligations under the contract; and (3) the plaintiff sustained damages.  Murphy v. Implicito, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).  There is no dispute that Colonial and Commonwealth entered into a valid contract.  There is also no dispute that Colonial has sustained damages by funding its own defense in the New Jersey litigation.  Therefore, the Cross-Motions for Summary Judgment only concern whether Commonwealth's denial of coverage amounted to a failure to perform its obligations under the Policy.  If so, Commonwealth has breached the contract, which is the Title Insurance Policy it had with Colonial.

11

First, as noted above, Colonial submits that it was an "insured" under the Policy and that the terms of the Policy do not preclude coverage when an insured assigns the underlying note and mortgage.  Commonwealth, on the other hand, contends that for there to be coverage, certain provisions require an interest to be maintained in the insured property.  Since Colonial transferred the Note and Mortgage to U.S. Bank, Commonwealth argues that Colonial was no longer an insured because it did not have an interest in the insured property.

When courts interpret an insurance policy, the policy must be "liberally construed in favor of the insured and strictly construed against the insurer."  Sandler v. N.J. Realty Title Ins. Co., 178 A.2d 1, 5 (N.J. 1962).  Even where, as here, the insured is a commercial entity, so long as the insured did not participate in drafting the insurance provisions at issue, these principles apply.[12]  Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co., 968 A.2d 724, 734 (N.J. Super. Ct. App. Div. 2009); see also Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 843 A.2d 1094, 1103 (N.J. 2004) (stating that these principals do not apply where sophisticated commercial entities "have participated in the drafting of the insurance contract" (emphasis added)).

In the absence of an ambiguity, an insurance policy should be interpreted according to its plain meaning.  Zacarias v. Allstate Ins. Co., 775 A.2d 1262, 1264 (N.J. 2001).  When an ambiguity exists, courts should interpret the contract in accordance with the "reasonable expectations" of the insured, even where a close reading of the written text reveals a contrary meaning.  Id.  That being said, courts must guard against rewriting policies in favor of the insured under the guise of interpreting a contract's reasonable terms.  Progressive Cas. Ins. Co., v. Hurley, 765 A.2d 195, 202 (N.J. 2001).

---

[12]  Commonwealth contends that Colonial knew that coverage would cease upon assignment because Colonial has experience in drafting title insurance policies.  (Doc. No. 16-1 at 12.)  Here, Colonial did not participate in drafting the Policy.  Therefore, Colonial's experience does not reduce the liberal construction of the policy in its favor and against the insurer.

In denying coverage on the basis that Colonial ceased to be an insured under the Policy following its assignment of the Note and Mortgage, Commonwealth relies upon the following provisions of the Policy: (1) the description of the Property in the section titled "Schedule A;" (2) the definition of the term "Insured" found under "Definition of Terms" in the "Conditions" section of the Policy; (3) the section describing "Covered Risks;" and (4) a provision titled "Continuation of Insurance" also under the "Conditions" section of the Policy.  The Court will review these provisions seriatim.

> **1.  Schedule A**

The section referred to as "Schedule A" in the Policy contains identifying information about the insured, the insured property, the policy date, policy amount, and the policy number.  The first few lines of Schedule A read as follows:

SCHEDULE A

Date of Policy: May 6, 2013      Amount of Insurance: $147,250.00
File No. NJPARK-711       Policy Number: 81307-88767395

1.  Name of Insured:

Colonial Mortgage Service Company of America
Its Successors and/or Assigns as Their Interests May Appear

(Doc. No. 1, Ex. A at 29.)  Commonwealth contends that the phrase "as Their Interests May Appear" contains words of limitation that "limits the insured to parties who have an interest in the mortgage."  (Doc. No. 16-1 at 14.)  This interpretation, however, is not in accord with a plain reading of the phrase.  See Zacarias, 775 A.2d at 1270 (emphasizing that terms in an insurance policy should be given their plain meaning).

"The grammatical construction of contracts generally requires that a qualifying or modifying phrase be construed as referring to its nearest antecedent."  New Castle Cnty., Del. v.

13

Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 174 F.3d 338, 348 (3d Cir. 1999).  Applying this rule of construction to the "Name of Insured" in Schedule A, the phrase "as Their Interests May Appear" modifies its closest antecedent, the phrase "Its Successors and/or Assigns."  It does not modify "Colonial Mortgage Service Company of America."  Colonial appears by itself on the preceding line.  Giving this text its plain meaning, Colonial Mortgage still remains a named insured under the Title Insurance Policy, even though it had transferred its interest in the Mortgage.[13]

Moreover, there is no ambiguity in the language.  In accordance with the rule of construction, the phrase "as Their Interests May Appear" only applies to the "Successors and/or Assigns" of Colonial.  Even if there were an ambiguity on whether the language "as Their Interests May Appear" applies to Colonial, the ambiguity must be resolved in favor of Colonial for the reasons noted above.  Thus, because the phrase in question would not apply to Colonial, it remains an "insured" despite the assignment of the Note and Mortgage.  See Nav-Its, Inc. v. Selective Ins. Co. of Am., 869 A.2d 929, 933 (N.J. 2005) (stating that "[i]f the policy is ambiguous, the policy will be construed in favor of the insured").  Thus, Commonwealth has not raised a genuine issue of material fact regarding Colonial's status as an insured based on the language in Schedule A.

### 2.        The Definition of "Insured" Under "Conditions"

The above interpretation of the "name of Insured" in Schedule A is consistent with the definition of the term "Insured" as it is defined under the "Conditions" section of the Policy.  This section is reproduced below:

---

[13] The language used in Schedule A, that the insured may include "Successors and/or Assigns" in the plural supports the notion that there may be more than one party who could be covered under the Policy.

\*\*\*

(e) "Insured":  The Insured named in Schedule A.

(i) The term "Insured" also includes

(A) the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary . . . .

\*\*\*

(Doc. No. 1, Ex. A at 39.)  Colonial argues that this provision also makes it an Insured under the Policy even after the transference of the Note and Mortgage.  Colonial asserts that it is the Insured referred to in Schedule A and that this provision merely allows for additional Insureds by using the language "the term 'Insured' also includes."  Commonwealth argues that Colonial incorrectly interprets this definition "as giving rise to concurrent coverage."  (Doc. No. 16-1 at 14.)  Commonwealth also claims that "the Policy does not say that coverage is concurrent; rather, it is according to their interests in the Property."  (Id.)  The Court disagrees with the position of Commonwealth.  The Policy simply does not include any language providing that coverage is limited to an insured's present interest in the Property or that coverage is precluded for two or more insureds concurrently. [14]

---

[14] Commonwealth cites the New Jersey Supreme Court case, <u>Shotmeyer v. N.J. Realty Title Ins. Co.</u>, 948 A.2d 600, 602 (N.J. 2008), for the proposition that the Policy here ceased to provide coverage upon Colonial's assignment of the Note and Mortgage.  (Doc. No. 16-1 at 17.)  The facts in <u>Shotmeyer</u> and the policy at issue in that case differ significantly from the facts and Policy in this case.  In fact, <u>Shotmeyer</u> supports the decision of this Court that Colonial remained an Insured under the Policy despite the transfer of the Note and Mortgage.

In <u>Shotmeyer</u>, two brothers purchased property as a general partnership and obtained an owner's policy of title insurance in connection with the purchase.  <u>Shotmeyer</u>, 948 A.2d at 602.  About ten years later, the brothers conveyed title of the property to their newly formed limited partnership.  <u>Id.</u> at 603.  The title insurance policy that covered the general partnership's purchase defined "insured" as:

The Court agrees with Colonial that the above definition of "Insured" provides for coverage of both the named insured in Schedule A as well as "each successor in ownership of the Indebtedness." The language in section (e)(i) of the definition that "[t]he term 'Insured' *also* includes" supports this proposition. (Doc. No. 1, Ex. A at 39) (emphasis added). Moreover, the section in the definition of "Insured"—that the Policy insures both "the owner of the Indebtedness *and* each successor in ownership of the Indebtedness"—supports the proposition that there can be several concurrent insureds under the Policy. (Id.) (emphasis added)[15]

---

> [T]he insured named in Schedule A, and, subject to any rights or defenses the Company may have had against the named insured, those who succeed to the interests of such insured by operation of law . . .

Id. When the brothers sought coverage under the policy after the conveyance of title to the limited liability partnership, the insurer denied coverage stating that "the insured no longer holds title to the land which was transferred to a new and separate legal entity." Id. (internal quotations omitted). Coverage ceased under the policy because the transfer did not occur by operation of law. The court noted that "the transfer of property to the limited partnership was a deliberate and voluntary conveyance to a separate legal entity . . . [and therefore] the transfer did not occur 'by operation of law' which would have continued the policy's coverage." The court emphasized this language in its decision to affirm the insurer's decision to deny coverage, stating that the policy only provided coverage for "the insured named in Schedule A" and "those who succeed the named insured 'by operation of law.'" Id. at 606.

The language of the Policy here is quite different. Unlike the policy in Shotmeyer, the Policy in this case does not contain a provision limiting coverage to those who succeed in interest by operation of law. By contrast, the Policy here states that it insures "the owner of the Indebtedness and each successor in ownership of the Indebtedness." This definition does not restrict coverage in the same way it was restricted in Shotmeyer.

[15] Commonwealth argues in its Cross-Motion for Partial Summary Judgment that since the Policy only provides for a specific dollar amount of coverage, permitting Colonial to make a claim under the Policy after it assigned the Note and Mortgage would reduce the amount of Insurance available to another future claimant and thus "produce disastrous results." (Doc. No. 16-1 at 15.) The Court disagrees. The Policy is a contract that Commonwealth drafted and was accepted by Colonial. Any successor or assignee of Colonial would be aware of the terms and conditions of the Policy and the amount of insurance. When parties enter into a contract through arm's length negotiations they are bound by its terms, even where as here, providing coverage for one insured may reduce the amount of coverage to another insured.

The plain meaning of the definition of "Insured" reads as a definition of inclusion and not exclusion. As noted, the term "Insured," as defined in the Policy, includes not only the named Insured in Schedule A, but "also" includes other parties that own the indebtedness. Commonwealth, therefore, has not raised a genuine issue of material fact that would exclude Colonial as an Insured under the definition of "Insured" in the Policy.

### 3. Covered Risks

The next provision at issue is contained in the section titled "Covered Risks." Specifically, Commonwealth contends that the language in number 12 in this section shows that the Policy does not continue to cover both Colonial and its assignee simultaneously. The "Covered Risks" section sets forth the types of risks covered under the Policy. The section begins:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE . . . AND THE CONDITIONS, COMMONWEALTH LAND TITLE INSURANCE COMPANY . . . insures as of Date of Policy, and to the extent stated . . . after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of . . .

(Doc. No. 1, Ex. A at 28.) Fourteen covered risks are then listed including, among other things, title being vested in another party, defects in title, unmarketable title, and the insured being prevented from accessing the insured property. The twelfth covered risk provides:

> 12. The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.
>
> ***

(Id.)

Here, the invalidity or unenforceability of an assignment is not present. There is no contention that the assignment made by Colonial to U.S. Bank under the "Correspondent

17

Mortgage Purchase Agreement" is invalid or unenforceable.  In fact, under the language of the Agreement, Colonial has a legal liability for its representations about holding a valid and enforceable lien.  If it does not have such a first lien, it may be required to repurchase the mortgage from U.S. Bank and to indemnify it.  (Doc. No. 14-4, Ex. C at 6.)  Therefore, Covered Risk 12 does not exclude Colonial from retaining coverage under the Policy following the assignment of the Note and Mortgage.

Commonwealth still contends, however, that "Covered Risk" 12 requires that any assignment be shown in Schedule A in order for an insured and its assignee to be covered concurrently under the Policy.  (Doc. No. 16-1 at 16-17.)  This argument is untenable because the modifying language "provided the assignment is shown in 'Schedule A'" only applies if the assignment is invalid or unenforceable.  This condition does not exist here.  Accordingly, Commonwealth's reliance on section 12 to disclaim coverage is unpersuasive.

### 4.      Continuation of Insurance Provision Under Conditions of the Policy

The final provision Commonwealth relies on to support its contention that Colonial is no longer insured under the Policy following the transference of the Note and Mortgage is the "Continuation of Insurance Provision" under the "Conditions" section.  This provision reads:

> The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title.  This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

(Doc. No. 1, Ex. A at 40.)  "Title" is defined as:

> ***
>
> (l) "Title": The estate or interest described in Schedule A.

\*\*\*

Schedule A provides in full as follows:

**SCHEDULE A**

Date of Policy: May 6, 2013    Amount of Insurance: $147,250.00
File No. NJPARK-711      Policy Number: 81307-88767395

1.  Name of Insured:

Colonial Mortgage Service Company of America
Its Successors and/or Assigns as Their Interests May Appear

2.  The estate or interest in the Land that is encumbered by the Insured Mortgage is:

Fee Simple

3.  Title is vested in:

Rebecca A. Bigos and Matthew A. Thomas,
as Joint Tenants with Right of Survivorship

By deed dated February 28, 2013 from Karyn Charise Lewis, recorded May 6, 2013 in the office of the Camden County Clerk in Deed OR Book 9800, Page 21.

4.  The Insured Mortgage and its Assignments, if any, are described as follows:

Mortgage dated March 29, 2013 from Rebecca A. Bigos and Matthew A. Thomas to Colonial Mortgage Service Company of America in the original principal amount of $147,250.00, recorded May 6, 2013 in the Office of the Camden County Clerk in Mortgage OR Book 9800, Page 25.

5.  The Land referred to in this Policy is described as follows:

See attached Legal Description.

(Doc. No. 1, Ex. A at 29.)  Commonwealth has taken two different positions on the application of

the "Continuation of Insurance Provision" as it applies to the definition of "Title."  First,

Commonwealth originally contended in its Motion for Partial Summary Judgment that the word

19

"Title" as used in the "Continuation of Insurance Provision" refers to a "Fee Simple" title vested

in Bigos and Thomas.  To support this claim, Commonwealth refers to the definition of title as

"The estate or interest described in Schedule A," which in turn states that "Fee Simple" title is

vested in Bigos and Thomas as joint tenants.  Since Colonial "does not and could not" have held

fee simple title to the Property, Commonwealth argues that Colonial could not transfer or convey

title to a third-party.  (Doc. No. 16-1 at 23.)

Colonial agreed with this interpretation in its Motion for Partial Summary Judgment and

its Response to Commonwealth's Cross-Motion for Partial Summary Judgment.  Colonial

argued, however, that this provision does not apply to it because it never held title to the Property

in Fee Simple.  For this reason, the provision in question does not cover the situation that exists

in this case where there has been an assignment of the Note and Mortgage.  (Doc. No. 18 at 9-

10.)

Realizing the inherent weakness of its argument, Commonwealth changed its position on

the applicability of the Continuation of Insurance Provision:

> Colonial argues for strict interpretation of the Policy language when referring to
> the term "Title" . . . . Colonial fails entirely to address the definition of "Title," as
> set forth in the Policy [which is] defined as "The estate or interest described in
> Schedule A."  Schedule A identifies both the Property and the Mortgage, such that
> any transfer of the Property or the Mortgage triggers the applicability of this
> provision.

(Doc. No. 19 at 4.)  Once again, this second argument is unavailing.  To begin with, there has

been no transfer or conveyance of Title as it is defined in the Policy.  The parties agree that

"Title" is defined under "Definitions" in the Policy as "The estate or interest described in

Schedule A."  (Doc. No. 1, Ex. A at 39.)  The only reference to "Title" in Schedule A is in

paragraph 3, which provides that Title is vested in Bigos and Thomas, as joint tenants with right

20

of survivorship.  This provision covers the owner of a property who holds title in fee simple.  It plainly has no application here.

Next, even if Commonwealth was correct and the definition of "Title" included the Mortgage, there is language in the "Continuation of Insurance Provision" that would support the continuation of coverage to Colonial.  The provision provides, among other things, that coverage shall continue following a conveyance or transfer of title so long as "the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title."  (Doc. No. 1, Ex. A at 40.)  The "Corresponding Mortgage Purchase Agreement," which controlled the assignment of the Mortgage and Note from Colonial to U.S. Bank, states that Colonial "represents, warrants, and covenants" as follows:

> a) The security agreement, deed of trust or other document securing the Mortgage Loan . . . has been executed . . . by any and all person(s) necessary to create and convey a valid and legally enforceable first lien obligation in favor of the Seller with respect to the Mortgage Note that is superior to all other liens or other claims . . .
>
> ***
>
> e) [Colonial] has good and merchantable title to the Mortgage Loan as of the Closing Date and the assignment of the Mortgage Loan from [Colonial] to Buyer is valid, sufficient, enforceable and conveys good title to such Mortgage Loan to Buyer, free and clear of any liens . . . .

(Doc. No. 14-4, Ex. C at 2.)

The agreement further states that "[Colonial] hereby agrees to repurchase any Mortgage Loan sold to Buyer at any time" upon the occurrence of any of the following events:

> ***
>
> d) Any representation or warranty made by [Colonial] under this Agreement or the Correspondent Manual with respect to any Mortgage Loan shall, in the reasonable opinion of Buyer, be, in whole or in part and with or without knowledge of [Colonial], false at the time when made by [Colonial], or become false upon the occurrence of subsequent events . . . .

21

(Doc. No. 14-4, Ex. C at 6.)  Therefore, under the "Corresponding Mortgage Purchase Agreement," Colonial made warranties and representations to U.S. Bank that Colonial held a superior first lien and that the lien of U.S. Bank would be superior to all other liens.  If this representation becomes false, Colonial must repurchase the Mortgage and Note.  Thus, since Colonial would have "liability by reason of warranties in any transfer or conveyance of the Title," the "Continuation of Insurance Provision" would provide Colonial with coverage based on the representations Colonial made to U.S. Bank.

Accordingly, there is no genuine issue of material fact as to whether Colonial was insured under the Title Insurance Policy.  Commonwealth has not established that such a genuine issue exists.  Colonial, therefore, is insured under the Policy even after the transfer of the Note and Mortgage.

### B.    The Duty to Defend

Commonwealth next argues that even if Colonial is insured under the Policy, the claims made in the New Jersey litigation are not covered risks and therefore it has no duty to defend Colonial.  The Policy describes Commonwealth's duty to defend in the section titled "Defense and Prosecution of Actions" under "Conditions."  It reads as follows:

> Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured.  This obligation is limited to only those stated causes of action alleging matters insured against by this policy.

(Doc. No. 1, Ex. A at 40.)

As noted previously, Customers has asserted the following claims against Colonial in the New Jersey litigation: (1) a constructive trust seeking the removal of Colonial's Mortgage on the Property; (2) constructive fraud arising from the fact that when Colonial recorded its mortgage,

Customers already had an equitable lien on the Property; (3) negligence, stemming from Colonial's negligence in closing on the Bigos and Thomas Property when it was aware of Customers' equitable lien; (4) tortious interference with Contract in that Colonial intentionally interfered with Customers' rights when it closed on the Bigos and Thomas Property; (5) successor liability seeking to hold Colonial liable for the fraudulent actions of Capital; and (6) civil conspiracy in that Colonial entered into an agreement with Park and others to defraud Customers.   (Doc. No. 18-1.)

The duty to defend arises "when the complaint states a claim constituting a risk insured against." Danek v. Hommer, 100 A.2d 198, 203 (N.J. Super. Ct. App. Div. 1953). Whether an insurer has a duty to defend is determined by comparing the allegations in the complaint with the language of the policy. When the two correspond, the duty to defend follows, irrespective of the claim's actual merit. Id. If the complaint is ambiguous, doubts should be resolved in favor of the insured and thus in favor of coverage. Cent. Nat'l Ins. Co. v. Utica Nat'l Ins. Group, 557 A.2d 693, 694 (N.J. Super. Ct. App. Div. 1989).

However, where a third-party complaint includes claims that are covered under the policy and claims that are not, the insurer is required to provide a defense for the covered claims only. See id., 557 A.2d at 695 (the duty to defend exists "only as to counts stating a theory of recovery for which coverage is provided, but not as to counts not covered"). Thus, the duty to defend extends only to claims within the coverage of the policy and not to non-covered claims. Morgan, Lewis & Bockius LLP v. Hanover Ins. Co., 929 F. Supp. 764, 774 (D.N.J. 1996); see also Grand Cove II Condo. Ass'n, Inc. v. Ginsburg, 676 A.2d 1123, 1131 (N.J. Super. Ct. App. Div. 1996) ("If an excluded claim is made, the insurer has no duty to undertake the expense and effort to defeat it, however frivolous it may appear.").

23

1.     **The Constructive Trust, Constructive Fraud, Negligence, and Civil Conspiracy Claims Are Covered Risks Under the Policy**

The first count in Customers' Complaint against Colonial requests that the Court impose a constructive trust on the Bigos and Thomas Property.  (Doc. No. 18-1 at ¶¶ 99-100.) Customers submits that a constructive trust must be imposed because it has an equitable lien on the Property dating from March 4, 2013 when Park falsely represented to Customers that its funds were used to close on the Property.  (Id. at ¶ 41.)  The assertion of an equitable lien and the related request to remove Colonial's Mortgage through a constructive trust renders this claim a "Covered Risk" under the Policy because the outcome of the claim will affect the priority of Colonial's Mortgage on the Property.  Covered Risk number ten guarantees coverage in the event there is a "lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance."  (Doc. No. 1, Ex. A at 28.)

Despite the evident nature that the constructive trust claim in the state litigation is a covered risk under the Policy, Commonwealth still argues that it is not a covered risk under the "Exclusions from Coverage" section of the Policy.  This argument is unavailing.  The "Exclusions from Coverage" section of the Policy on which Commonwealth relies states that it will not cover claims "attach[ed] or created subsequent to Date of Policy."  (Doc. No. 1, Ex. A at 38.)  Here, the request for a constructive trust is based on Customers' assertion that it had an equitable lien on the Property dating from March 4, 2013.  The lis pendens was filed on April 11, 2013.  (Doc. No. 18-1 at ¶¶ 41, 56.)  Colonial closed on the Bigos and Thomas Property on March 29, 2013 and Commonwealth issued the Policy on May 6, 2013 as noted in Schedule A. (Doc. No. 1, Ex. A at 29.)  May 6, 2013 is therefore the "Date of Policy."  Thus, the equitable lien and the lis pendens were in existence at the time the Policy was issued and were not created subsequent to the effective date of the Policy.

Commonwealth also argues that another Policy exclusion applies in this case.  Subpart 3(c) of the "Exclusions from Coverage" provides that "the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of . . . [d]efects, liens, encumbrances, adverse claims, or other matters . . . resulting in no loss or damage to the Insured Claimant." (Doc. No. 1, Ex. A at 38.)  Commonwealth contends that because Colonial no longer owns the Mortgage and received payment for its interest in the Mortgage from U.S. Bank, Colonial has not suffered a loss.

This argument fails to acknowledge the existence of warranties and representations that Colonial had made to U.S. Bank when it transferred the Mortgage and Note.  In particular, Colonial is bound to repurchase the loan from U.S. Bank in the event that any representation Colonial made "becomes false."  (Doc. No. 14-4, Ex. C at 6.) ("Seller hereby agrees to repurchase any mortgage Loan sold to Buyer at any time upon the occurrence of . . . [a]ny representation or warranty made by Seller under this Agreement . . .  which shall, in the reasonable opinion of Buyer . . . become false upon the occurrence of subsequent events.")  In addition, Colonial faces a breach of warranty action because it represented that the Mortgage was a first lien on the Property, which is a disputed fact in the New Jersey litigation.  Therefore, the argument that this exclusion applies because Colonial suffered no loss is without merit.

In addition, the constructive fraud, negligence, and civil conspiracy claims asserted in Customers' Complaint against Colonial are also covered under the Policy.  These claims assert that Colonial "was aware of Customers' equitable lien" at the time Colonial recorded its mortgage.  (Doc. No. 18-1 at ¶¶ 102, 109, 140.)  In denying coverage of these claims, Commonwealth invokes another "Exclusions from Coverage" section of the Policy.  Specifically, the exclusion in subpart 3(a) and (b), which reads:

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

***

3.      Defects, liens, encumbrances, adverse claims, or other matters

(a)      created, suffered, assumed, or agreed to by the Insured Claimant;

(b)      not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under the Policy.

(Doc. No. 1, Ex. A at 38.)  Commonwealth argues that this exclusion applies because these claims as set forth in Customers' Complaint allege that Colonial had knowledge of the equitable lien on the Bigos and Thomas Property.[16]  Commonwealth argues it had no knowledge of this "defect" in title and therefore this exclusion applies to prevent coverage.  The Court disagrees.  In the New Jersey litigation, Customers names Commonwealth also as a defendant in the constructive fraud, negligence, and civil conspiracy claims[17] which allege that Commonwealth had knowledge of the equitable lien.  Thus, the exclusion in subpart 3(a) and (b) would not apply since the defect would be "Known to the Company."

Because Commonwealth is also named as a defendant in the state court action, it is bound by the allegations in the Complaint filed by Customers to the same extent that Colonial is bound.  Whether an insurer has a duty to defend is determined by comparing the allegations in the

---

[16] The exclusion in subpart 3(a) and (b) does not apply to the "Constructive Trust" claim because that claim does not allege or require that Colonial have knowledge of Customers' interest in the Property.  The constructive trust claim states that "in equity and good conscience . . . Colonial should not have recorded Colonial's mortgage on the Bigos Property."  (Doc. No. 18-1 at ¶ 100.)  Because the claim does not allege or rely on the fact that Colonial knew of the adverse claim on the Property when Colonial recorded its Mortgage, the constructive trust claim, as noted, does not fall under this exclusion.

[17] Customers names Commonwealth as a defendant in these claims based on the actions of Park, Commonwealth's agent.

complaint with the language of the policy.  When the two correspond, the duty to defend follows, irrespective of the claim's actual merit.  <u>Danek</u>, 100 A.2d at 203.  Here, the Complaint alleges that both Commonwealth and Colonial were aware of Customer's equitable lien on the Bigos and Thomas Property at the time Colonial recorded its mortgage.  Because the Complaint asserts that the defect was "Known to the Company" at the time Commonwealth issued the Policy, the "Exclusion from Coverage" in subpart 3(a) and (b) does not apply to bar coverage of these claims.

Moreover, these claims unequivocally involve the priority of Colonial's Mortgage on the Bigos and Thomas Property.  As noted by Colonial, these claims are "premised upon . . . the equitable lien" Customers purports to hold on the Property.  (Doc. No. 18 at 16.)  The constructive fraud claim alleges that the actions of Colonial, Commonwealth and others had the legal effect of fraud when they closed on the Bigos and Thomas Property because they were aware of Customers' equitable lien.  (Doc. No. 18-1 at ¶ 102.)  The negligence claim states that Colonial, Commonwealth and others were negligent in closing on the Property at a time when they were aware of Customers' equitable lien on the property.  (Doc. No. 18-1 at ¶ 109.)  The civil conspiracy claim asserts that Colonial, Commonwealth and others conspired to defraud Customers when they were aware of Customers' equitable lien and proceeded to close on the Bigos and Thomas Property.  (Doc. No. 18-1 at ¶ 140.)  Implicit in each of these claims is the notion that Colonial should not have closed on the Bigos and Thomas Property because of Customers' equitable lien and that Customers had a superior interest in the Property at the time Colonial recorded its Mortgage.  Because these claims directly relate to whether there was a superior lien on the Bigos and Thomas Property at the time Colonial recorded its mortgage, they are "Covered Risks" under the Policy.

Comparing the allegations in the constructive trust, constructive fraud, negligence, and civil conspiracy claims in the Complaint filed in the New Jersey litigation with the language of the Policy, it is evident that Commonwealth has failed to raise a genuine issue of material fact that would excuse its duty to defend Colonial on the constructive trust, constructive fraud, negligence, and civil conspiracy claims.  See Voorhees v. Mut. Ins. Co., 607 A.2d 1255, 1259 (N.J. 1992) (when allegations in the complaint correspond with covered risks under the policy, the "duty to defend arises, irrespective of the claims actual merit").  Accordingly, Commonwealth is obligated to defend Colonial on the above claims asserted in the New Jersey litigation.

**2.     The Balance of the Claims Are Not Covered Risks Under the Policy**

Commonwealth further argues that the balance of the claims asserted in the New Jersey litigation are not covered risks under the Policy.  The Court agrees.  The claims of tortious interference and successor liability are not listed as "Covered Risks" in the Policy.  These torts do not specifically relate to defects in title to the Thomas and Bigos Property or to the interest of an insured.  The tortious interference with contract claim in Customers' Complaint asserts that Colonial intentionally interfered with Customers' contract, and the successor liability claim in the Complaint seeks to hold Colonial liable for the fraudulent actions of Capital.  A lender's policy of title insurance is not a policy of general liability insurance protecting the insured against liability for damages in tort, but rather a "contract that protects [] against loss caused by defective title to the land."  N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co., 1 A.3d 632, 638 (N.J. 2010) (citations omitted).  Because these claims are not "Covered Risks" under the Policy, they are not covered claims.

28

For the reasons stated above, Colonial is entitled to a grant of summary judgment on the constructive trust, constructive fraud, negligence, and civil conspiracy claims, and Commonwealth is entitled to a grant of summary judgment on the other claims.

### 3.    Commonwealth's Duty to Defend Covered Claims

The parties dispute the responsibility of Commonwealth to defend Colonial in the New Jersey litigation when covered and non-covered claims have been asserted.  Colonial argues that because Customers' Complaint includes covered claims, "Commonwealth must defend until those claims are eliminated."  (Doc. No. 18 at 5.)  Commonwealth argues, on the other hand, that under New Jersey law, where covered and non-covered claims are made, insurers are not required to defend even the covered claims.  (Doc. No. 19 at 7-8.)  Rather, Commonwealth's solution is that the duty to defend should be converted into a duty to reimburse.  (Id. at 8.)  This solution is not acceptable because an insurance company has a duty to defend.  Colonial contracted in the Policy for a defense in the event of litigation, not for reimbursement in the event that Commonwealth wrongfully denied coverage.  Accordingly, the Court must resolve what Commonwealth's duty is in defending a case in New Jersey state court when there are covered and non-covered claims.

In Morrone v. Harleysville Mutual Insurance Co., the court held that an insurer improperly declined to provide a defense for its insured where covered and non-covered claims were asserted in the underlying litigation.  662 A.2d 562, 563 (N.J. Super. Ct. App. Div. 1995).  The litigation was still ongoing when the court issued its holding that the insured "must provide a defense, subject to appropriate apportionment and reimbursement."  Id.  As to how the parties should accomplish this task while the underlying lawsuit was still pending, the court suggested that "the insurer . . . finance the costs of defense, subject to a right of reimbursement" in order to

fulfill its defense obligations.  Id. at 567.  The court suggested that the parties work out the method of apportioning the costs of defending non-covered claims at the end of the litigation. Id.; see also Morgan, Lewis & Bockius LLP v. Hanover Ins. Co., 929 F. Supp. 764, 773 (D.N.J. 1996) (finding that an insurer's suggestion to pay for fifty percent of defense costs at the end of litigation involving covered and non-covered claims was an "equitable and fair" solution).

The court in Morrone relied on the Supreme Court of New Jersey case, Hartford Accident & Indem. Co. v. Aetna Life and Cas. Ins. Co., 483 A.2d 402 (N.J. 1984).  There, the court held that generally an insured must initially finance the defense subject to reimbursement from the insurer pending the resolution on the coverage question.  Id. at 407 n.3.  However, where there is no question that coverage exists on certain claims, "the initial costs of defense should be borne not by the insured  . . .  but by the insurers . . . subject to a final allocation of that cost after trial of the coverage question."  Id.

In Szelc v. Stanger, the District Court of New Jersey evaluated whether a title insurance company had a duty to defend its insured when the underlying litigation contained both covered and non-covered claims.  Civ. No. 08-4782, 2009 WL 4573425, at *1 (D.N.J. December 3, 2009).  Like the situation in Morrone, the underlying litigation was still ongoing in Szelc when the court issued its opinion.  The court advised the parties of their obligations as follows:

> At this time, the Court will not determine precisely what [the insurer] must do to satisfy its duty to defend.  [The insured] is entitled to a defense of those specific counts named above; [the insurer] owes no duty to defend [the insured] on the other claims.  Therefore, the parties will have to work out how [the insurer] can "appropriately" provide this "partial" defense.  The record as it currently exists is not sufficiently developed to justify the entry of an order specifically apportioning defense costs between the parties.  The [c]ourt can only enter declaratory relief to the effect described above, leaving the details to be resolved by agreement between the parties—or by further motion to this Court if such agreement proves elusive

Id. at *4.

30

In view of the above authority, this Court finds that Commonwealth has a duty to defend Colonial in the New Jersey state litigation on all claims.  In Morrone, the court suggested that the insurer finance the cost of the defense subject to reimbursement at the end of the trial for the defense of non-covered claims.  This Court agrees with the approach in Morrone that Commonwealth has a duty to defend all claims subject to appropriate apportionment and reimbursement when the case is over.  Even the Policy states that Commonwealth, "at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation . . . ." (Doc. No. 1, Ex. A at 40.)  Thus far, Colonial has assumed the costs of its own defense in the New Jersey litigation, but now that this Court has determined coverage on certain claims exists, Commonwealth must bear the costs of the defense on all six claims.  When the state litigation terminates, this Court will rely on the parties in the first instance to determine the proper apportionment of expenses at the conclusion of that litigation.  If the parties are not able to agree, they can apply to the Court for a ruling.  Pending the outcome of the New Jersey litigation, and following the issuance of this Opinion, the Court will place this case in suspense and await further communication from counsel for the parties.

## IV.      CONCLUSION

Based on the language of the Policy, Commonwealth has not shown that a genuine issue of material fact exists that would justify denial of coverage on the constructive trust, constructive fraud, negligence, and civil conspiracy claims.  Moreover, Colonial has not shown that a genuine issue of material fact exists that would justify coverage for the tortious interference with contract and successor liability claims under the Policy.  Therefore, this Court finds that Commonwealth breached the Policy only to the extent that it denied coverage on the claims of constructive trust, constructive fraud, negligence, and civil conspiracy.  However, because there are covered claims,

Commonwealth has a duty to defend Colonial on all claims in the state court litigation subject to apportionment of expenses for defending the non-covered claims after the state court case has terminated.  Based upon the foregoing, an appropriate Order follows.